UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KATIE MOULDING, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-11248-ADB |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BURROUGHS, D.J.

In this personal injury suit, brought against the United States of America (the "Government") pursuant to the Federal Tort Claims Act (the "FTCA"), Plaintiff Katie Moulding alleges that, on November 17, 2018, a Government employee, Kyler Brown, negligently struck her while operating a small postal truck (the "LLV"). [ECF No. 1 ("Compl.")]. For the reasons set forth below, the Court finds that the Government is liable under the FTCA and will enter a $46,410 judgment in Ms. Moulding's favor.

## I.   PROCEDURAL HISTORY

On June 30, 2020, Ms. Moulding filed suit against the Government under the FTCA. [Compl.]. The Government answered on September 25, 2020. [ECF No. 6]. Neither party filed dispositive motions and, after discovery concluded, trial was scheduled. On June 22, 2021, the parties filed proposed findings of fact and conclusions of law. [ECF Nos. 26–28]. During the three-day bench trial that began on June 29, 2021,[1] the Court heard testimony from three fact

---

[1] There is no right to a jury trial in this type of FTCA case. See 28 U.S.C. § 2402; 32 C.F.R. § 750.32.

witnesses (Ms. Moulding, Ms. Moulding's husband, and Mr. Brown) and two expert witnesses (Dr. N. George Kasparyan and Dr. Errol Mortimer), and roughly fifty exhibits were admitted into evidence.  [ECF Nos. 29–31].

Having considered the evidence presented at trial and the parties' arguments, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.    FINDINGS OF FACT

### A.    Ms. Moulding, Mr. Brown, and the LLV

Ms. Moulding lives with her husband, Christopher Moulding, and their three children in Wareham, Massachusetts.  She enjoys a variety of outdoor recreational activities, including jogging, hiking, cycling, and kayaking.  Before November 17, 2018, Ms. Moulding was in good health and never had any medical issues with her left hand, elbow, or shoulder or her neck.

On November 17, 2018, Mr. Brown was a City Carrier Assistant ("CCA") with the United States Postal Service ("USPS"), who had been working for the USPS since the late summer of 2018.  He was familiar with the LLV and had been adequately trained in how to safely operate the vehicle.

The LLV is different from an ordinary American vehicle in two main ways.[2]  First, the driver sits on the right side.  Second, it has seven mirrors, located at various places on the vehicle.  As is relevant here, Mirror #3 (the "Mirror")—which is called a "pot lid mirror" presumably because it is shaped like the lid of a kitchen pot—is located on the front left section of the hood and protrudes slightly past the front bumper.

---

[2] During trial, the Court viewed the actual LLV involved in the incident.

B.      **The Incident**

On Saturday November 17, 2018, Mr. Brown began the day delivering mail on foot.
After finishing his route, Mr. Brown was assigned to meet another CCA so that he could
complete a portion of that CCA's route.  Accordingly, sometime during the afternoon,
Mr. Brown got into the LLV and drove to meet the other CCA.  The portion of the other CCA's
route that Mr. Brown was assigned to complete included Hathaway Street in Wareham,
Massachusetts.  Hathaway Street is a two-lane, paved road.  It is relatively heavily-trafficked, the
speed limit is approximately 35 miles per hour, and there is no sidewalk.

Once he collected the mail from the other CCA, Mr. Brown proceeded to drive down the
odd-numbered side of Hathaway Street to make his deliveries.  When he reached 219 Hathaway
Street, he made a right turn into the driveway and drove towards the house.[3]  Once he got near
the house, he executed a three-point turn so that the LLV was facing Hathaway Street, parked the
vehicle, turned it off, and made his delivery.  After making the delivery, he got back into the
LLV and drove down the driveway towards Hathaway Street.  Because his next delivery stop
was in the same direction that he had been traveling before stopping at 219 Hathaway, he needed
to make a right turn out of the driveway to get back onto Hathaway Street going in the correct
direction.  He stopped the LLV near the end of the driveway, intending to turn right onto
Hathaway Street when there was an opening in the oncoming vehicular traffic coming from his
left.  From where he stopped in the driveway, his view of the oncoming traffic was at least
partially obstructed by brush, foliage, and a telephone pole to the left of the LLV.  To get a better
view, he moved the LLV forward a few feet towards Hathaway Street and stopped again.

---

[3] Mr. Brown testified that although driving onto private property, like a driveway, is against
USPS policy, he did so that day at 219 Hathaway Street because he viewed it as the safest course
of action and the parcel he was delivering was too large to fit into the road-side mailbox.

Meanwhile, that same day, in the early afternoon, Ms. Moulding, an experienced recreational runner, went jogging on one of her favorite routes: Dinah's Way.  Dinah's Way is a roughly 2-mile route that required Ms. Moulding to (1) run down Lincoln Hill Terrace, (2) make a left on Main Street, (3) make a left on Hathaway Street, (4) loop around Dinah's way, (5) turn right on Hathaway Street, (6) turn right on Main Street, and (7) run back up Lincoln Hill Terrace to her home.  As she typically did, she was listening to music on her iPod and running against traffic.

About four minutes into her run, Ms. Moulding turned left onto Hathaway Street.  When she made the turn, she began running on the paved surface of the road, about six inches from the edge and against traffic, which she understood to be safer because it allowed her to see oncoming cars.  She scanned Hathaway Street and noticed the LLV, ahead of her and to her left.  The LLV was in the driveway at 219 Hathaway Street, on the same side of the road that she was running on, facing the street.  The vehicle was stationary, and by her estimation, about one tenth of a mile away.  As she approached the LLV, she slowed down to assess the situation and determine whether it was safe to run past the vehicle.  She attempted to make eye contact with Mr. Brown, but was unable to do so as she was on his right, and he was looking left to gauge the traffic coming from that direction.  Even though she did not make eye contact with Mr. Brown (or otherwise get his attention), she determined that it was safe to proceed, and began to jog in front of the LLV.

What happened next and how it happened are the key disputed facts in this case.  It is undisputed that Ms. Moulding and the vehicle collided, but whether or not the vehicle was moving at the time of impact is disputed.  Ms. Moulding testified that when she was roughly halfway across the front of the LLV, it began to move forward and turn right, and the Mirror

caught the inside of her left arm.  Mr. Brown maintains that the vehicle was stationary and that Ms. Moulding banged the outside of her left arm on the protruding Mirror of the motionless LLV as she ran by it.  At trial, both Ms. Moulding and Mr. Brown were credible witnesses, and the Court firmly believes that neither purposefully provided untruthful testimony.  Their differing accounts merely reflect the fact that the incident, which was over in a matter of seconds, was undoubtedly startling and stressful for both (and occurred nearly three years ago).  Still, it is the Court's job to make findings of fact, and, here, the Court finds that the LLV was inching forward when the Mirror struck the inside of Ms. Moulding's left arm.[4]  More specifically, the Court finds that Mr. Brown was looking to his left to view oncoming traffic, did not look to his right to determine whether there were any pedestrians, and began to inch forward and initiate his right turn onto Hathaway Street.  When the LLV started to move, Ms. Moulding, who was by then in front of it, was startled by the movement, accelerated to attempt to avoid the vehicle, and raised her left arm in a defensive movement.  Despite her efforts, the Mirror caught the inside of her left arm.  She did not fall to the ground or get dragged, and no other part of her body came into contact with the vehicle.[5]

---

[4] The Court's conclusion is supported by other record evidence.  Immediately after the collision, Ms. Moulding approached Mr. Brown and told him to be more careful, to which he said either nothing or that he was sorry.  If Ms. Moulding had hit her arm on a non-moving vehicle, she would not have told Mr. Brown to be more careful and Mr. Brown would have pointed out to her that his vehicle was stationary.  Additionally, Mr. Brown essentially conceded at trial that he should have been more careful, which would make sense only if the LLV was moving.  Finally, Mr. Brown's testimony that Ms. Moulding hit the outside of her arm on the Mirror is inconsistent with the Mouldings' testimony, and Ms. Moulding's medical records, concerning the location of the bruise on her arm.

[5] With respect to the precise sequence of events, it is difficult to stitch together exactly what happened when.  While Ms. Moulding testified that the LLV was motionless from the time she first saw it from the top of the hill on Hathaway Street until it struck her, Mr. Brown testified that Ms. Moulding hit the Mirror within a few seconds of his moving the LLV forward after his initial stop in order to obtain a better sightline.  As best as the Court can tell, the events unfolded

After untangling her arm from the Mirror, Ms. Moulding approached Mr. Brown, and the two had a brief discussion.  Although Ms. Moulding and Mr. Brown offered significantly differing accounts of their conversation,[6] they agree that Ms. Moulding told Mr. Brown that he needed to be more careful and that he either said nothing or that he was sorry.  Ms. Moulding then left the scene, resumed her running route, and returned home.  Before continuing his mail route, Mr. Brown stayed in the driveway for a while to confirm that Ms. Moulding was okay and to compose himself.

### C.    Post-Incident Events

Upon returning home, Ms. Moulding told Mr. Moulding about the incident.  Both Mouldings observed a bruise on the inside of her left arm.[7]  Over the next few days, Ms. Moulding's left arm was sore and painful.

On November 28, 2018, Ms. Moulding saw her primary care physician, Dr. Ken Gendreau, about her left arm.[8]  Then, between December 2018 and March 2020, seeking relief

---

as follows: (1) Mr. Brown made his initial stop about five or six feet from Hathaway Street; (2) Mr. Brown moved the LLV forward to get an unobstructed view and stopped again, a foot or two away from Hathaway Street; (3) Ms. Moulding began to cross in front of the LLV, on the edge of Hathaway Street; (4) without looking to his right, Mr. Brown began to inch forward to make a right turn; and (5) the Mirror hit Ms. Moulding.  In any event, regardless of whether the LLV struck Ms. Moulding after its first stop or after its second stop, the Court finds that the LLV was moving when the Mirror struck Ms. Moulding's left arm.

[6] Although not material, the Court credits Mr. Brown's testimony that he responded to Ms. Moulding's questions.

[7] Her arm was still bruised when she visited her doctor on November 28, 2018.

[8] Ms. Moulding first reported the incident to the USPS on November 26, 2018.  At trial, the Government attempted to discredit Ms. Moulding's testimony by pointing out that she did not (1) call the police following the incident, (2) insist that Mr. Brown call his supervisor following the incident, (3) report the incident to USPS until November 26, 2018, or (4) see a doctor until November 28, 2018.  The Court credits Ms. Moulding's testimony that, initially, she did not think that her pain and other symptoms would last as long as they did.  Additionally, the incident

from her pain and other symptoms, Ms. Moulding saw a host of physicians, with varying areas of expertise: (1) Dr. Christian Dee (an orthopedic surgeon); (2) Dr. Andrew Mazur (a physiatrist); (3) Dr. Andrew Rogers (an orthopedic surgeon); (4) Dr. Anthony Wong (a pain management specialist); (5) Dr. Simon Cornelissen (an orthopedic surgeon); (6) Dr. Ryan Murphy (an orthopedic surgeon); and (7) Dr. Walter Sussman (a physiatrist).[9]  Ms. Moulding consistently reported the same symptoms related to her left shoulder, elbow, hand, and fingers, including pain, numbness, coldness, and tingling, but none of the physicians were able to definitively diagnose the problem.  Most of the objective tests that Ms. Moulding's doctors administered—including two electromyograph tests ("EMGs"), the gold standard for objectively measuring nerve damage—came back negative (i.e., normal).[10]  Still, none of her physicians expressed any suspicions that Ms. Moulding was malingering.  In March 2020, Dr. Sussman performed a hydrodissection injection procedure on Ms. Moulding.  The procedure gave her complete relief

---

[9] She also saw physical therapists and physical therapy assistants.  Ms. Moulding testified that these physical therapy sessions alleviated some of her symptoms in the short-term, but that she did not obtain permanent relief.  During trial, the Government highlighted the fact that the records from her physical therapy sessions show that Ms. Moulding reported progressively lower levels of pain, her ability to complete day-to-day tasks was largely unimpeded, and further, that she did not get massage therapy or see a chiropractor as recommended by Dr. Dee, suggesting that she would have done so if she were still experiencing discomfort.

[10] Although the parties did not move the results from the second EMG into evidence, they agree that it was taken and came back normal.

occurred five days before Thanksgiving, which is a busy time of year for Ms. Moulding personally and professionally.  In sum, it was reasonable for Ms. Moulding to take a wait-and-see approach with respect to her injury, and the Court does not view Ms. Moulding's lack of urgency as evidence that she was not actually injured.

for approximately five months, but then her symptoms returned.  She visited Dr. Sussman again in August 2020 to discuss the possibility of another hydrodissection injection.[11]

Ms. Moulding still experiences the same symptoms.  She plans to get another hydrodissection injection, but has not yet done so because of the COVID-19 pandemic. Although the Government theorizes that the impact with the LLV caused a bruise which healed quickly and that Ms. Moulding was thereafter either malingering or suffering renewed pain because of a subsequent injury, perhaps related to her home office set up, the Court finds her testimony about the pain and its cause to be credible.  The Court further finds that her efforts to get relief were consistent and appropriate, albeit a bit circumscribed by the pandemic.

## III.    CONCLUSIONS OF LAW

For the reasons set forth below, the Court finds that (1) Mr. Brown was negligent, (2) Ms. Moulding's own negligence contributed to her injury, and (3) Ms. Moulding is entitled to compensatory damages.

### A.    Liability

Under the FTCA,

the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

---

[11] At trial, the Government highlighted the fact that Dr. Sussman's notes from the August 2020 appointment state that Ms. Moulding attributed her recurrent symptoms to "her new work set up at home due to the coronavirus pandemic."  Ms. Moulding denied reporting that her symptoms were caused by her home office.  Regardless of what she told Dr. Sussman, the Court finds that the home office set up may have exacerbated her symptoms, but it was not the cause of the injury.

28 U.S.C. § 1346(b)(1).  Here, the parties agree that Mr. Brown was a government employee acting within the scope of his employment at the time of the incident.  Accordingly, the key question is whether Ms. Moulding's personal injury was caused by Mr. Brown's "negligent or wrongful act or omission."  Because the incident occurred in Massachusetts, Massachusetts tort law applies.  See id.

        1.     <u>Mr. Brown's Negligence</u>

In a negligence action, the plaintiff "has the burden of proving each and every element of that claim: duty, breach of duty (or, the element of negligence), causation (actual and proximate) and damages."  <u>Ulwick v. DeChristopher</u>, 582 N.E.2d 954, 958 (Mass. 1991).  "Under Massachusetts law, an operator of an automobile is under a duty to exercise reasonable care in the operation of his or her vehicle."  <u>Deguio v. United States</u>, 732 F. Supp. 1240, 1245 (D. Mass. 1990).  An individual breaches that duty "if he, either by act or omission, failed to exercise the degree of care that a reasonably prudent driver would have exercised under the same driving conditions and circumstances that [he] faced on the [day of the accident]."  <u>Id.</u>  Still, "[t]he mere happening of an accident between a motor vehicle and a pedestrian, where the circumstances immediately preceding it are left to conjecture, is not sufficient to prove negligence on the part of the operator of the vehicle."  <u>Spano v. Wilson Tisdale Co.</u>, 279 N.E.2d 725, 727 (Mass. 1972).  "Causation has traditionally involved two separate components: the defendant had to be both a factual cause (or 'cause in fact') and a legal cause of the harm."  <u>Doull v. Foster</u>, 163 N.E.3d 976, 982–83 (Mass. 2021).  "Generally, a defendant is a factual cause of a harm if the harm would not have occurred 'but for' the defendant's negligent conduct."  <u>Id.</u> at 983.  "Additionally, for the defendant to be liable, the defendant must also have been a legal cause of the harm.  This means that the harm must have been 'within the scope of the foreseeable risk arising from the

negligent conduct.'" Id. (quoting Leavitt v. Brockton Hosp., Inc., 907 N.E.3d 213, 220 (Mass. 2009)).

Here, Ms. Moulding has carried her burden.  First, as a driver, Mr. Brown owed Ms. Moulding a duty to drive the LLV with reasonable care.  See Deguio, 732 F. Supp. at 1245. Second, the Court finds that by failing to look to his right before moving the vehicle, Mr. Brown "failed to exercise the degree of care that a reasonably prudent driver would have exercised under the same driving conditions and circumstances that [he] faced on [November 17, 2018]." Id.  In other words, he should have looked both ways for potential dangers, including both vehicles and pedestrians, before pulling onto a busy road from an intersecting driveway.  The Court acknowledges that Hathaway Street (1) did not have a sidewalk, which may have led Mr. Brown to discount the possibility of a pedestrian approaching his vehicle, and (2) was well-trafficked, which meant that he needed to pay significant attention to the cars coming from his left as he prepared to make a right turn.  Nonetheless, Mr. Brown should have confirmed that there were no pedestrians in the LLV's path before inching forward.  Accordingly, his failure to do so was a breach of his duty to exercise reasonable care.[12]  Third, the Court finds that Mr. Brown's negligence was both a but-for cause and a proximate cause of Ms. Moulding's injury.  As to but-for causation, if Mr. Brown had not inched forward without looking both ways, the Mirror would not have hit Ms. Moulding's arm.  As to proximate causation, hitting a

---

[12] At trial, Ms. Moulding elicited testimony from Mr. Brown that, following the accident, his driving privileges were revoked, and he was required to re-complete a defensive driving course. The Government objected, citing Federal Rule of Evidence 407, which provides that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . negligence . . ." Fed. R. Evid. 407. The Court overruled the Government's objection, finding that the USPS's post-incident action was not a subsequent remedial measure, but rather arguably evidence of acknowledged fault.  In any event, the Court did not rely on those facts in making its liability determination and commends the USPS on its prudent and timely response.

pedestrian is unquestionably within the scope of the foreseeable risk of failing to look both ways before pulling out of a driveway.  Finally, as discussed infra, the Court finds that Ms. Moulding has met her burden of demonstrating damages.  Because Ms. Moulding has established all four elements of a negligence claim under Massachusetts law, the Government is liable under the FTCA.

## 2.   Ms. Moulding's Contributory Negligence

Under Massachusetts law, a tort plaintiff cannot recover if he or she was negligent and more than fifty percent at fault for the accident.  See Brillante v. United States, 449 F. Supp. 597, 600 (D. Mass. 1978) ("[A] plaintiff is precluded from recovering whenever his negligence is a proximate cause of the accident and exceeds 50%."); Shantigar Found. v. Bear Mountain Builders, 804 N.E.2d 324, 328 n.4 (Mass. 2004) ("[T]he plaintiff in a single-defendant case may not recover if found to be more than fifty per cent at fault.").  If a plaintiff is negligent, but is less than fifty percent responsible, his or her damages shall be reduced in proportion to his or her comparative fault.  Mass. Gen. Laws ch. 231, § 85 ("Contributory negligence shall not bar recovery in any action by any person or legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the total amount of negligence attributable to the person or persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.").

Here, although Mr. Brown should have looked both ways before moving the LLV, Ms. Moulding similarly should not have run across the front of a vehicle that was positioned to pull out of a driveway and onto a road that had significant oncoming traffic without ensuring that Mr. Brown was aware of her, either by making eye contact with him or verbally alerting him to

her presence.  As Ms. Moulding acknowledged, she knew that best practices required her to make eye contact and she attempted to do so, albeit unsuccessfully.  Accordingly, the Court finds that Ms. Moulding was contributorily negligent.

With respect to precisely what percentage of the blame Ms. Moulding bears, the Court notes that apportioning blame is, by nature, an inexact science.  Based on its assessment of the evidence, the Court finds that Ms. Moulding was thirty percent responsible for the incident.

### B.      Damages

Having decided liability, the Court must determine damages.  "The rule of damages is a practical instrumentality for the administration of justice.  The principle on which it is founded is compensation.  Its object is to afford the equivalent in money for the actual loss caused by the wrong of another."  Daniels v. Celeste, 21 N.E.2d 1, 2 (Mass. 1939).

> Generally, the measure of damages in negligence for personal injury is fair compensation for the resulting injuries, which includes pain and suffering; reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

Donovan v. Philip Morris USA, Inc., 914 N.E.2d 891, 899 (Mass. 2009).  Here, Ms. Moulding seeks two forms of damages: medical expenses and pain and suffering.

As to medical expenses, Ms. Moulding asserts that her medical expenses totaled roughly $11,300.  Neither party spent any time discussing medical expenses at trial, and the Government does not seem to dispute the accuracy of this figure.

With respect to pain and suffering, Ms. Moulding testified that since the incident, she has felt pain, numbness, tingling, and coldness in her left shoulder, elbow, hand, and fingers. Because of these symptoms, she (1) has difficulty sleeping comfortably, (2) feels like she cannot "be present" at home or at work, (3) derives less joy from recreational activities, including

jogging and cycling, than she used to, and (4) is generally less happy than she used to be. Mr. Moulding corroborated his wife's testimony regarding the effect of the incident on her lifestyle and mood, noting that, since November 2018, she has had less energy, is less optimistic, and has had trouble sleeping.

Additionally, each party offered expert testimony concerning damages.  Ms. Moulding's expert, Dr. N. George Kasparyan, an orthopedic surgeon, reviewed Ms. Moulding's medical records and examined her on February 26, 2021.  Based on his examination, Dr. Kasparyan diagnosed Ms. Moulding with a variety of ailments, including cubital tunnel syndrome, intermittent brachial neuritis, and tardy ulnar nerve palsy, which he attributed to the LLV incident, and concluded that she suffered a twenty-five percent permanent impairment to the left upper extremity.[13]  The Government's expert, Dr. Errol Mortimer, also an orthopedic surgeon, reviewed Ms. Moulding's medical records and responded to Dr. Kasparyan's report, but did not examine Ms. Moulding.  Dr. Mortimer opined that: (1) Ms. Moulding bruised her left shoulder and ulnar nerve, (2) her symptoms should have resolved relatively quickly, (3) no objective medical tests have demonstrated any specific pathology, (4) her ongoing complaints are inconsistent with both her medical records and her injury (i.e., her ongoing symptoms defy medical explanation),[14] and (5) Dr. Kasparyan misapplied the American Medical Association

---

[13] During trial, Dr. Kasparyan admitted that in his report, he had mistakenly written that Ms. Moulding's EMG tests were positive for ulnar nerve irritation when they were, in fact, negative.  He nevertheless testified that the negative EMG tests would not alter his opinion because nerve problems do not always show up on EMG tests.

[14] Dr. Mortimer did not, however, express a belief that Ms. Moulding is faking or exaggerating her symptoms.

("AMA") guidelines when calculating Ms. Moulding's twenty-five precent permanent impairment rating.[15]

Ultimately, based on its consideration of all the evidence, including the testimony of the two experts, the Court concludes that Ms. Moulding is entitled to $66,300 in damages, which includes $11,300 in medical expenses and $55,000 for her past and future pain and suffering.[16] Because of the incident, Ms. Moulding has fairly consistently dealt with pain, numbness, tingling, and coldness, and has generally found less joy in life because of those symptoms. Although she has continued to work, seems capable of handling day-to-day tasks, and still engages in some of her favored recreational activities, doing so has been more difficult.  The Court views $55,000 as adequate compensation for Ms. Moulding's past and (reasonably probable) future pain and suffering.[17]  In light of the Court's finding regarding contributory negligence, Ms. Moulding's total recovery will be reduced by thirty percent, and judgment will

---

[15] When asked what impairment rating, if any, he would assign to Ms. Moulding, Dr. Mortimer testified that, assuming Ms. Moulding's complaints are valid and that Dr. Kasparyan's diagnoses were correct, her left upper extremity permanent impairment would be nine percent, as properly calculated under the AMA guidelines.  Dr. Mortimer qualified this testimony by noting that he would not himself calculate an impairment rating without first examining Ms. Moulding.

[16] With respect to the parties' dueling experts, the Court is skeptical that Dr. Kasparyan correctly applied the AMA guidelines when calculating Ms. Moulding's permanent impairment rating. Additionally, he failed to acknowledge the positive effects of Ms. Moulding's physical therapy and mischaracterized her EMG results.  As to Dr. Mortimer, although he testified that Ms. Moulding's symptoms defy medical explanation, the fact remains that prior to the collision, she was in good health and since the incident—apart from a five-month respite brought on by her hydrodissection injection—she credibly reports chronic pain and other symptoms in her left arm. Further, there is no evidence in the record pointing to another event, before or after the collision, that would explain her ongoing symptoms.

[17] The Court notes that the hydrodissection injection administered by Dr. Sussman completely alleviated Ms. Moulding's symptoms for five months.  Neither party offered evidence regarding how often hydrodissection injections can be administered, how costly they are, and whether they diminish in effectiveness over time (i.e., whether the second injection provides less relief than the first).

therefore enter in Ms. Moulding's favor in the amount of $46,410 (i.e., seventy percent of

$66,300).

**IV.   CONCLUSION**

Accordingly, for the reasons stated above, the Government is liable under the FTCA, and

a $46,410 judgment will enter in Ms. Moulding's favor.

**SO ORDERED**

July 20, 2021                                              /s/ Allison D. Burroughs
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE